UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND; and ARTHUR H. BUNTE, JR., as Trustee,<br><br>*Plaintiffs*,<br><br>v.<br><br>PHBC, LLC, a Michigan limited liability company; ML LAND COMPANY, L.L.C., a Michigan Limited liability company; L & L LAND COMPANY, LLC f/k/a L & L LAND COMPANY LIMITED PARTNERSHIP, a Michigan limited liability company; and MICHAEL LAUTH, an individual<br><br>*Defendants*. | Case No. 16-cv-8439<br><br>Judge John Robert Blakey<br><br>Magistrate Judge Sheila Finnegan |

**PLAINTIFFS' MEMORANDUM IN SUPPORT
OF THEIR SUMMARY JUDGMENT MOTION**

Non-party Port Huron Building Supply Co. ("PHBS") incurred withdrawal liability to the Central States, Southeast and Southwest Areas Pension Fund (the "Fund") under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1001 *et seq*. As shown below, the entity Defendants are jointly and severally liable for that withdrawal liability because they were trades or businesses under common control with PHBS on the date of withdrawal. *See* 29 U.S.C. § 1301(b)(1); *Cent. States Se. & Sw. Areas Pension Fund v. Messina Prods., LLC*, 706 F.3d 874, 878 (7th Cir. 2013). Further, Defendant Michael Lauth is personally liable for the withdrawal liability because the pre-withdrawal conversion of entity Defendant L & L Land Company, LLC f/k/a L & L Land Company Limited Partnership ("L&L") from a partnership to an LLC is to be disregarded, as it was done for a principal purpose of eliminating the personal liability Michael

Lauth would have had for the withdrawal liability as an L&L general partner. *See* 29 U.S.C. § 1392(c). Thus, the Fund asks the Court to enter summary judgment against all Defendants.

## STATUTORY BACKGROUND

An employer that effects a withdrawal from a multiemployer fund must pay withdrawal liability in an amount roughly equal to its share of a fund's unfunded vested benefits. 29 U.S.C. §§ 1381, 1391. An employer may initiate arbitration to challenge a withdrawal liability assessment after it satisfies certain requirements, but if the employer fails to initiate arbitration, the amount demanded by the fund becomes due and owing. 29 U.S.C. § 1401(a)(1) & (b)(1). Also, although an employer may usually pay withdrawal liability according to a schedule, 29 U.S.C. § 1399(c)(2), a fund may require immediate payment of the outstanding amount of withdrawal liability where a default—such as the employer failing to cure a missed payment within 60 days of receiving notice thereof—occurs. 29 U.S.C. § 1399(c)(5)(A).

Further, under 29 U.S.C. § 1301(b)(1), all trades or businesses under common control with the withdrawing entity on the withdrawal date are jointly and severally liable for the withdrawal liability. *Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. El Paso CGP Co.*, 525 F.3d 591, 595 (7th Cir. 2008). Also, to prevent parties from using transactions to "shirk[] their" withdrawal liability "obligations," *id.* at 596, 29 U.S.C. § 1392(c) provides that any transaction done with a principal purpose of evading or avoiding withdrawal liability is to be disregarded for purposes of determining and collecting withdrawal liability.

## FACTUAL BACKGROUND

**I.     The withdrawal liability, the judgment against PHBS, and the parties in this case.**

The Fund determined that, due to a decline in PHBS's contributions to the Fund, PHBS effected a partial withdrawal on December 31, 2012 and incurred withdrawal liability in the principal amount of $2,114,166.93. (*Id.*, ¶ 9.) Subsequently, PHBS received from the Fund a

notice and demand for payment of the withdrawal liability (which gave PHBS the option of paying through monthly payments), followed by a past due notice. (*Id.*, ¶¶ 10-11.) No withdrawal liability payments were made after the past due notice was received, and arbitration was not initiated in relation to the withdrawal liability. (*Id.*, ¶ 12.) Also, in 2016, the Fund obtained a judgment against PHBS for the withdrawal liability, but the full principal amount of the withdrawal liability remains due and owing. *Cent. States, Se. and Sw. Areas Pension Fund, et al. v. Port Huron Building Supply Co.*, No. 15-cv-2559, Dkt No. 39, N.D. Ill. (*Id.*, ¶ 13.)

Also, on December 31, 2012, Defendant Michael Lauth owned at least 80% of the combined voting power of all classes of outstanding PHBS stock entitled to vote (or at least 80% of the value of outstanding shares of all classes of PHBS stock) and also owned at least 80% of the ownership interests of both entity Defendant PHBC, LLC ("PHBC") and entity Defendant ML Land Company, L.L.C. f/k/a M and G Land Company, L.L.C. ("ML Co."). (*Id.*, ¶¶ 6-7.) Also, Michael Lauth's only sibling, Cynthia Chapdelaine, is living, while his father Harold Lauth died in 1994 and his mother Constance Lauth died in July 2011. (*Id.*, ¶ 8.)

**II.      ML Co.'s operations.**

In 1997, M and G Land Company, L.L.C. (which changed its name to ML Land Company, L.L.C in or before August 2000) and its members entered into an operating agreement. (*Id.*, ¶¶ 14, 16.) In September 2000, ML Co. executed amended by-laws, and from no later than 2007 through 2017, ML Co. was a formally organized Michigan LLC. (*Id.*, ¶¶ 15, 18)

Also, in or before 2008, ML Co. applied for and received a Federal Employer Identification Number ("FEIN"). (*Id.*, ¶ 19.) Further, for each year from 2008 to 2015, Michael Lauth filed federal tax returns that included a Schedule C called "Profit or Loss from Business." (*Id.*, ¶ 20.) In each of those Schedules C, Michael Lauth: identified ML Co.'s "Principal

business" activity ("Construction"); listed ML Co.'s "Business address"; stated that he "'materially participate[d]' in the operation of this business" (*i.e.*, ML Co.); and identified ML Co. expenses (including taxes and licenses for each year from 2008 to 2015 and bank charges, repairs and maintenance, and office expenses for one or more years during that period), which he deducted as "Business . . . Loss[es]" on his 2008 to 2015 federal returns. (*Id.*, ¶¶ 20-21.)

In March 1998, ML Co. (then called M & G Land Company, LLC) entered into a land contract in which it agreed to convey a real estate parcel to Willy's Workshop, Inc. (a car restoration business) in exchange for $87,000 plus interest via monthly $900 payments. (*Id.*, ¶ 22.) ML Co. continued to own the parcel until February 2014, when it transferred it to Willy's Workshop. (*Id.*, ¶ 23.) Also, at some point during March 1998 to February 2014, ML Co., upon Willy's Workshop's request, built an addition to the parcel through agents that ML Co. paid, and it charged for the addition by increasing the principal amount due under the land contract. (*Id.*, ¶ 24.) From March 1998 to February 2014, Willy's Workshop sent ML Co. monthly $900 checks, which ML Co. deposited into a bank account it maintained. (*Id.*, ¶ 25.) In addition, from 2005 through 2015, an individual (Laurie Baker) performed work for ML Land, including by balancing ML Land's checkbook each month. (*Id.*, ¶ 26.)

### III. PHBC's operations.

PHBC was a formally organized LLC from no later than 2007 through at least 2017. (*Id.*, ¶ 28.) From in or before 2008 through at least 2016, PHBC owned the real estate at both 3555 and 3536 Electric Avenue in Port Huron, Michigan. (*Id.*, ¶ 29.) From 2008 through April 2016, PHBS used offices at and operated a retail hardware store at PHBC's 3555 Electric property. (*Id.*, ¶ 30.) Similarly, during the period of 2008 through at least April 2013, PHBS operated a concrete block plant on PHBC's 3536 Electric property. (*Id.*, ¶ 30.)

## IV. L&L's operations and ownership.

In 1990, L & L Land Company Limited Partnership was formed as a Michigan limited partnership. (*Id.*, ¶ 31.) In addition, from 1990 through December 10, 2009, Michael Lauth was an L&L general partner. (*Id.*, ¶ 32.) On December 10, 2009, L&L, through the law firm of Couzens Lansky Fealk Ellis Roeder & Lazar, P.C. ("Couzens Lansky"), faxed to the State of Michigan—and the State filed the next day—a document signed by Michael Lauth that converted L&L from a limited partnership to an LLC (the "Conversion"). (*Id.*, ¶ 33.)[1] Also, on December 11, 2009, L&L and its members—including Michael Lauth's revocable trust and other trusts he was a beneficiary of—executed an operating agreement. (*Id.*, ¶ 35.)

From 2010 to 2016, L&L was a formally organized LLC. (*Id.*, ¶ 36.) Further, during 2010 to 2015, L&L leased 11 commercial real estate parcels (6 of which it leased during that entire period) and 6 residential parcels (including 4 during that entire period) and received at least $275,000 in rents per year. (*Id.*, ¶¶ 37-39.) Further, from 2008 to 2015, L&L had agents perform work for it, including repairs and maintenance on its rental parcels. (*Id.*, ¶ 40.) Also, in each of its federal tax returns for 2010 to 2015, L&L deducted expenses for repairs, insurance, legal and professional fees, taxes, and utilities and listed a "[p]rincipal business activity" ("Real Estate"). (*Id.*, ¶ 42.) Further, in or before 2009, L&L applied for and received an FEIN. (*Id.*, ¶ 43.)

Also, from January 2008 through the Conversion, the Harold Lauth Marital Trust ("Marital Trust") owned at least 42.22% of and Michael Lauth owned 50% of L&L's profit, loss, and capital interests. (*Id.*, ¶ 44.) Since the Conversion, there have been 200 Class A (*i.e.*, voting) units and 1800 Class B (*i.e.*, non-voting) units in L&L. (*Id.*, ¶ 45.) Initially, the Marital Trust owned 84.44 of L&L's Class A units and 759.96 of L&L's Class B units, the Harold Lauth

---

[1] In 2005, Michael Lauth signed a "Certificate of Conversion" purporting to convert L & L to an LLC, but that document was never submitted to the State of Michigan and the State never filed it. (SMF, ¶ 34.)

Residuary Trust ("Residuary Trust") owned 15.56 Class A and 140.04 Class B units, and Michael Lauth's living trust (which he has the right to revoke) owned the remaining 100 Class A and 900 Class B units. (*Id.*, ¶ 46.) Then, on December 30, 2009, 422.218 Class B units owned by the Marital Trust were transferred to Cynthia Chapdelaine (the "Non-Voting Units Transfer"). (*Id.*, ¶ 47.) Subsequently, on April 3, 2013, Michael Lauth, as the Marital Trust's trustee, on the one hand and Michael Lauth and Ms. Chapdelaine on the other hand executed an "Assignment." (*Id.*, ¶ 48.) The Assignment provided that on "[t]his 3 day of April, but effective as of January 1, 2013," the Marital Trust was "transfer[ing]" and "assign[ing]", among other things, 42.21791 L&L Class A units to Michael Lauth and 42.22209 L&L Class A units to Ms. Chapdelaine (this transfer to Ms. Chapdelaine is referred to as the "Voting Units Transfer"). (*Id.*, ¶ 48.)

## ARGUMENT

Here, given the undisputed facts, the Fund is entitled to summary judgment as a matter of law against all Defendants. *See* Fed. R. Civ. P. 56.

**I.      ML Co., PHBC, and L&L were under common control with PHBS.**

Under 29 U.S.C. § 1301(b)(1), whether trades or businesses are under common control is governed by regulations that incorporate IRS regulations. Under those IRS regulations, entities are under common control if the same five or fewer persons directly or indirectly own a controlling interest (*i.e.*, at least an 80% ownership interest) in each entity and exercise effective control over each entity by owning more than 50% of the ownership interests. 26 C.F.R. § 1.414(c)-2(b)(2)-(c)(2). As discussed, on the withdrawal date, Michael Lauth owned at least an 80% ownership interest in PHBS, ML Co., and PHBC. (SMF, ¶¶ 6-7.) Thus, he had a controlling interest and effective control of all three entities, putting them under common control.

Also, PHBS and L&L were under common control on the withdrawal date. A person has a controlling interest over an LLC that issues membership units where he or she owns units "possessing at least 80 percent of total combined voting power of all classes of" units "entitled to vote" or possessing "at least 80 percent of the total value of" all units in the LLC, and a person has effective control over such an LLC where he or she owns units "possessing at least 50 percent of total combined voting power of all classes of" units "entitled to vote" or possessing "at least 50 percent of the total value of" all units in the LLC. 26 C.F.R. § 1.414(c)-2(b)(2) - (2)(c)(2). In addition, interests held by a revocable trust are deemed owned by the grantor of that trust, 26 C.F.R. § 1.414(c)-4(b)(3)(iii) and 26 U.S.C. § 676(a), and interests that any trust owns in an organization are deemed owned by the trust's beneficiaries who have an actuarial interest of 5% or more in the organizational interest, to the extent of such actuarial interest, 26 C.F.R. § 1.414(c)-4(b)(3)(i). A beneficiary's actuarial interest in an organization is determined by assuming the maximum exercise of discretion by the trustee in favor of the beneficiary. 26 C.F.R. § 1.414(c)-4(b)(3)(i). Further, if a person has an option to acquire an interest in an organization, that person is deemed to own that interest. 26 C.F.R. § 1.414(c)-4(b)(1).

Here, because the Voting Units Transfer's actual date (April 3, 2013) and purported effective date (January 1, 2013) were after the date of withdrawal (December 31, 2012), as of the withdrawal date the ownership of L&L's Class A units was the same as it was in December 2009 (Marital Trust (84.44), Residuary Trust (15.56), and Michael Lauth's living trust (100)). (SMF, ¶¶ 46, 48.) In addition to being deemed to own the 100 Class A units his revocable trust owned on the withdrawal date, Michael Lauth was deemed to own the remaining 100 Class A units owned by the Marital Trust and Residuary Trust (both of which were created pursuant to Harold

Lauth's living trust agreement ("Trust Agreement") after Harold Lauth died (SMF, ¶ 49)).[2] Specifically, under Article 11(E) of the Trust Agreement, after Constance Lauth's death (and after the trustees paid amounts from the Marital Trust's principal and made any discretionary payments under Article 11(E)(1)), the trustees were to distribute the Marital Trust's corpus—including the 84.44 L&L Class A units—to the Residuary Trust under Article 11(E)(2). (SMF, ¶ 50.) Further, Article 12 ("Post Death Trust: Residuary Trust"), Part I(A) states that "[u]pon the death of the later to die of" Harold and Constance Lauth, the "Disinterested Trustee shall" determine whether Michael Lauth "is desirous of operating" PHBS and L&L and "shall allocate, to the extent possible, the businesses owned by the Grantor to the share of [Michael Lauth] if he is [so] desirous." (SMF, ¶ 51.) Part I(A) also states that Michael Lauth "shall have the option for [365] days to purchase the portions of said businesses not so allocated to him." (SMF, ¶ 52.)

In sum, after Constance Lauth's July 2011 death (see SMF, ¶ 8) through the 2013 Voting Units Transfer, Michael Lauth, pursuant to part 1.414(c)-4(b)(3)(i), owned all 100 L&L Class A units owned by the Marital and Residuary Trusts because the trustee had discretion to distribute all those units to Mr. Lauth. Further, even if the trustee did not have discretion to give Mr. Lauth all those units, Mr. Lauth still owned of all them under part 1.414(c)-4(b)(1) because he had an option to purchase the L&L units the trustee did not distribute to him. Thus, on the withdrawal date, Mr. Lauth was deemed to own all 200 L&L Class A units, giving him a controlling interest and effective control of L&L and putting L&L under common control with PHBS.

## II.     ML Co. was a trade or business on the date of withdrawal.

An enterprise is a trade or business if it is conducted: (1) for the primary purpose of income or profit; and (2) with continuity and regularity. *Cent. States, Se. & Sw. Pension Fund v.*

---

[2] Although Harold Lauth's living trust was amended multiple times (SMF, ¶ 49), Plaintiffs only cite the portions of the trust that have been in effect from 1990 to present. Further, although the Trust Agreement references multiple trustees, in 2008 Michael Lauth became the sole trustee. (SMF, ¶ 53.)

*Personnel, Inc.*, 974 F.2d 789, 794 (7th Cir. 1992) (citing *C.I.R. v. Groetzinger*, 480 U.S. 23, 35 (1987).) In applying this test, courts examine, among other things, the enterprise's legal form, purpose, and tax status. *Cent. States, Se. & Sw. Areas Pension Fund v. CLP Venture LLC*, 760 F.3d 745, 749 (7th Cir. 2013).

    A.    **ML Co.'s legal form, purpose, and tax status show it was a trade or business.**

Regarding legal form, the Seventh Circuit has held that "Section 1301(b)(1) presents no interpretive difficulties when it is used to impute withdrawal liability to [a] formally recognized business organization," and that because "formal business organizations ordinarily operate with continuity and regularity and are ordinarily formed for the primary purpose of income or profit, it seems highly unlikely that a formal for-profit business organization would not qualify as a 'trade or business.'" *CLP*, 760 F.3d at 749-50 (citations omitted). Here, ML Co. was a formally organized business organization (an LLC) from no later 2007 through at least 2017. (SMF, ¶ 15.)

Also, "a defendant's stated intention of forming a business"—such as adopting a "business plan" in an operating agreement—"is highly relevant, because it constitutes a declaration against interest." *Messina*, 706 F.3d at 885-86. Here, ML Co. admitted it was a business by stating in both its operating agreement and amended by-laws that it could "conduct its business under . . . assumed names" and by agreeing in its operating agreement to terms relating to "fulfill[ing] its business purposes" and "continu[ing] [its] business." (SMF, ¶¶ 16, 18.)

In applying the *Groetzinger* test, the Seventh Circuit has also examined entities' tax status, including whether the entity identified a business activity in tax returns, *Messina*, 706 F.3d at 886, and/or had an FEIN, *Cent. States, Se. & Sw. Areas Pension Fund v. SCOFBP, LLC*, 668 F.3d 873, 879 (7th Cir. 2011); *CLP*, 760 F.3d at 750, and whether the entity's expenses were deducted, *see, e.g.*, *Cent. States, Se. & Sw. Areas Pension Fund v. Neiman*, 285 F.3d 587, 595

(7th Cir. 2002); *CLP*, 760 F.3d at 750. Here, ML Co. applied for and received an FEIN, and in his 2008 to 2015 federal tax returns Michael Lauth listed a principal business activity ("Construction") for ML Co. and deducted ML Co.'s expenses as "Business" losses. (SMF, ¶¶ 19-21.) In sum, ML Co.'s legal form, admissions, and tax status show it was a trade or business.

### B. ML Co. existed for the primary purpose of income or profit.

The entity Defendants do not dispute that they existed for the primary purpose of income or profit. (SMF, ¶ 27.) Further, in addition to the above facts, other facts show that ML Co. existed for that primary purpose. For example, in its operating agreement, ML Co. set forth how its "net profits" and "income" would be split among its members. (SMF, ¶ 17.) *See, e.g.*, *SCOFBP,* 668 F.3d at 879 (deeming relevant LLC indicating its intent to make income or profit in its operating agreement). Also, ML Co. received monthly income from Willy's Workshop, as discussed. (SMF, ¶ 25.) In short, ML Co. existed for the primary purpose of income or profit.

### C. ML Co. operated with regularity and continuity.

Further, although the LLC in *Messina* "never sold any goods or performed any services," had no employees, and only had one asset—an interest in a company that received rents for (but did not manage) real estate—the court held that the LLC's "activities, although minimal, were conducted with sufficient continuity and regularity . . . particularly where they were done under the auspices of a formal, for-profit organization." 706 F. 3d at 886. Here, unlike the LLC in *Messina*, ML Co. owned and sold tangible assets, including the parcel Willy's Workshop used. (SMF, ¶¶ 22-23.) Further, whereas the LLC in *Messina* merely held an interest in an entity that collected rents, from March 1998 through February 2014 ML Co. owned and directly received monthly payments relating to that parcel. (SMF, ¶¶ 23, 25.) Also, unlike the LLC in *Messina*, ML Co. performed a service (building an addition) through agents it paid. (SMF, ¶ 24.) Further,

during 2005 to 2015, Laurie Baker performed work each month for ML Co. (SMF, ¶ 26.) Thus, ML Co. operated with regularity and continuity.

### III. PHBC was a trade or business on the date of withdrawal.

In this Circuit, "leasing property to a withdrawing employer itself is categorically a 'trade or business.'" *SCOFBP*, 668 F.3d at 879. Underlying this rule is that where property is "rented to or used by the withdrawing employer and there is common ownership, it is improbable that the rental activity" is not a trade or business. *Messina*, 706 F.3d at 881. Here, from 2008 through 2012, PHBC owned real estate parcels that the withdrawing employer PHBS used in PHBS's operations. (SMF, ¶¶ 29-30.) Thus, PHBC was a trade or business on the withdrawal date.

### IV. L&L was a trade or business on the date of withdrawal.

That L&L leased multiple commercial and residential real estate parcels during 2010 to 2015 and made at least $275,000 in rental income each of those years show that L&L meets both elements of the *Groetzinger* test. (SMF, ¶¶ 37-39.) Also, L&L's admissions, tax status, and legal form show that it was a trade or business. For example, in its operating agreement, L&L referred to "conduct[ing] its business." (SMF, ¶ 35.) Further, L&L applied for and received an FEIN, and it listed a "[p]rincipal business activity" and claimed business deductions on each of its 2010 to 2015 federal tax returns. (SMF, ¶¶ 41-43.) Also, L&L was a formally organized LLC from 2010 to 2015. (SMF, ¶ 36.) In short, L&L was indisputably a trade or business on the withdrawal date.

### V. Michael Lauth is personally liable for the withdrawal liability.

Under 29 U.S.C. § 1392(c) "[i]f a principal purpose of any transaction is to evade or avoid" withdrawal liability, then withdrawal liability "shall be determined and collected" without "regard to such transaction." Because section 1392(c) requires only that "*a* principal purpose" be "to escape withdrawal liability," avoiding withdrawal liability needs to be only "one of the

factors that weighed heavily in the [] thinking." *Santa Fe Pac. Corp. v. Cent. States, Se. & Sw. Areas Pension Fund*, 22 F.3d 725, 727 (7th Cir. 1994) (emphasis in original).

Here, the events occurring before and after the Conversion show that at least one of the Conversion's principal purposes (if not the principal purpose) was for Michael Lauth to avoid being held personally liable for the withdrawal liability as an L&L general partner.[3] Specifically, from 2002 to 2009, PHBS requested and received from the Fund six withdrawal liability estimates, which were provided to Michael Lauth. (SMF, ¶ 56.) Then, in 2009, just weeks after the Conversion, Cynthia Chapdelaine received 21% of all L&L units (the Non-Voting Units Transfer), and in 2013 Ms. Chapdelaine received 21% of L&L's Class A units (the Voting Units Transfer). (SMF, ¶¶ 47-48.) Those two transfers collectively ensured that Ms. Chapdelaine received just enough L&L units (21%) to reduce Michael Lauth's interest in L&L to 79%, just below the 80% controlling interest threshold. Adding to the suspiciousness of that result, Ms. Chapdelaine did not even know that either transfer was happening until she was given transfer documents to sign and did not know why either transfer was made to her. (SMF, ¶ 54.) In fact, as Michael Lauth admitted, Ms. Chapdelaine wanted money (not ownership units) from the Marital Trust. (SMF, ¶ 55.) That the Conversion occurred just weeks before the first of the two transfers shows that avoiding the personal liability Mr. Lauth would have had for the withdrawal liability as an L&L general partner was a principal purpose of the Conversion.

The communications between Michael Lauth and his attorneys further demonstrate that a principal purpose of the Conversion was to avoid withdrawal liability. Specifically, those communications show that in the months leading up to the December 2009 Conversion and Non-Voting Units Transfer, Mr. Lauth and his attorneys: were preoccupied with L&L and Michael

---

[3] *See* Mich. Stat. §§ 449.1403(b), 449.15 (general partner liable for limited partnership's debts).

Lauth's withdrawal liability exposure; confirmed that L&L was under common control with PHBS; and in response to confirming that, made the Conversion and the Non-Voting Units Transfer. More specifically:

- **August 2008**: attorney Charles Kelly emails Michael Lauth and Couzens Lansky attorney Jack Couzens about a "meeting to discuss [PHBS] pension liability" and "possible personal or 'control group' liability for M. Lauth or other M. Lauth business interests, including L&L." (SMF, ¶ 57.)

- **December 2008**: attorney Jack Couzens drafts notes about a "possible transfer of L&L interests and possible risk of pension liability for M. Lauth and L&L." (*Id.*, ¶ 58.)

- **February 2009**: attorney Charles Kelly emails Michael Lauth about the "results of analysis of possible control group between [PHBS] and L&L" and emails attorney Jack Couzens about a "discussion with M. Lauth regarding L&L interests and possible pension liability exposure." (*Id.*, ¶ 59.)

- **March 2009**: Couzens Lansky attorney Kathryn Sussman requests that the IRS calculate the actuarial interests of the Marital Trust's and Residuary Trust's beneficiaries "for purposes of determining a controlled group status of certain entities." (*Id.*, ¶ 60.)

- **In or around October 2009:** The IRS tells Ms. Sussman that the actuarial interests in the Marital Trust are 60% Constance Lauth, 20% Michael Lauth, and 20% Cynthia Chapdelaine, which does not align with Couzens Lansky's prior determination of those interests and means Michael Lauth has a controlling interest in L&L. (*Id.*, ¶ 61.)[4]

- **November 2009**: attorney Jack Couzens emails attorney Charles Kelly about the "response from IRS regarding ownership interests in L&L through H. Lauth trusts and possible next steps concerning pension issues." (*Id.*, ¶ 62.) Couzens Lansky attorney Larry Schiller then emails Michael Lauth about a "discussion . . . regarding withdrawal liability issues" and attorney Jack Couzens about a "conversation with . . . M. Lauth . . . concerning pension and possible control group liability for [PHBS] and L&L." (*Id.*, ¶ 63.) Couzens Lansky attorneys then draft notes about: "conversion of partnership to LLC and M. Lauth percentage of holdings in L&L"; and a "conference" with Michael Lauth "re L&L conversion to LLC" and "percentage of M. Lauth, C. Lauth and C. Chapdelaine holdings in L&L." (*Id.*, ¶ 64.)

---

[4] Specifically, because Michael Lauth had at least a 20% actuarial interest in the L&L units held by the Marital Trust and also owned 50% of L&L directly, he had effective control of L&L. See 26 C.F.R. § 1.414(c)-2(b)(2)-(c)(2). Accordingly, both his 20% and his mother's 60% actuarial interest in the at least 42.22% of L&L owned by the Marital Trust were treated as owned by him, *see* 26 C.F.R. § 1.414(c)-4(b)(3)(i), (b)(6)(ii), such that he was deemed to own 80% of the portion of L&L owned by the Marital Trust. As a result, he was deemed to own at least 83.776% (*i.e.*, 50%, plus 80% of 42.22%) of L&L, giving him a controlling interest.

As the above shows, when they decided to perform the Conversion and Non-Voting Units Transfer in December 2009, Michael Lauth and his attorneys were preoccupied with Mr. Lauth and L&L avoiding withdrawal liability. In fact, on December 29, 2009, attorney Jack Couzens expressed concern that L&L and Michael Lauth could be liable to the Fund under ERISA's evade or avoid provision. Specifically, on that date, Mr. Couzens wrote Michael Lauth about "pension liability, transfer of C. Lauth L&L interest to C. Chapdelaine and impact on L&L pension liability and possible control group liability, possible 'evade' liability challenges to transfer, possible future [PHBS] withdrawals from Pension Fund, M. Lauth possible pension liability due to other holdings, and conversion of L&L to an LLC." (*Id.*, ¶ 65.)

Further, Michael Lauth and his attorneys remained preoccupied with L&L and Mr. Lauth's withdrawal liability exposure up until the Voting Units Transfer was done in 2013. For example, in January 2012, Kathryn Sussman drafted a memorandum "discussing ownership interests of H. Lauth and C. Lauth trusts in L&L and [PHBS]" and "possible control group liability." (SMF, ¶ 66.) Then, on a May 16, 2012 letter from Ms. Sussman relating to the upcoming Voting Units Transfer, Michael Lauth wrote "21%" next to a chart indicating that Ms. Chapdelaine would receive 42.22209 of L&L's 200 Class A units, which just happened to be the percentage needed to reduce Michael Lauth's ownership in those L&L Class A units below the 80% controlling interest threshold needed for a controlling interest. (SMF, ¶ 67.)

In short, the facts show that the Conversion was part of a series of transactions that each had a principal purpose of attempting to avoid withdrawal liability. In fact, L&L and Michael Lauth never offered any reason for the Conversion other than that it was done "on advice of counsel."[5] Thus, pursuant to 29 U.S.C. § 1392(c), the Conversion should be disregarded and

---

[5] More specifically, in its 30(b)(6) deposition, L&L testified it had been converted to an LLC upon "advice of counsel," and L&L refused on privilege grounds to identify the substantive reason(s) for the

Case: 1:16-cv-08439 Document #: 64 Filed: 06/22/18 Page 15 of 16 PageID #:687

L&L should therefore still be treated as if it is a partnership of which Michael Lauth is a general partner, making him personally liable for the withdrawal liability.

## VI.     The Fund is entitled to damages under section 1132(g) and post-judgment interest.

Under 29 U.S.C. § 1132(g)(2), which 29 U.S.C. § 1451(b) makes applicable to withdrawal liability cases, a court "shall" award a fund that prevails in a withdrawal liability action the delinquent withdrawal liability principal, plus interest, the greater of double interest or liquidated damages, and attorneys' fees and costs. Further, under the Fund's trust agreement, the Fund is entitled to post-judgment interest on the judgment balance at an annualized interest rate equal to 2% plus the prime interest rate established by JPMorgan Chase Bank for the 15th day of the month for which the interest is charged, compounded annually. (SMF, ¶ 69.)

## CONCLUSION

Accordingly, Plaintiffs request that this Court enter summary judgment for the Fund and against Defendants, jointly and severally, for the principal amount of the withdrawal liability, plus the amounts set forth in section 1132(g)(2) and post-judgment interest.[6]

| June 22, 2018 | */s/ Andrew J. Herink*<br>Andrew J. Herink (#06303510)<br>Central States Law Department<br>9377 West Higgins Road, 10th Floor<br>Rosemont, Illinois 60018<br>Phone: (847) 939-2458<br>Fax: (847) 518-9797<br>aherink@centralstatesfunds.org |
|---|---|

---

Conversion. (SMF, ¶ 68.) As a result, the Court should preclude L&L from introducing evidence as to why it performed the Conversion. *See, e.g.*, *Edward Lowe Indus., Inc. v. Oil-Dri Corp. of Am.*, No. 94 C 7568, 1995 WL 609231, at *5 (N.D. Ill. Oct. 13, 1995) (party barred from introducing evidence that it asserted was privileged in discovery).

[6] Plaintiffs will move to establish these amounts should the Court grant their summary judgment motion.

TM: 564522 / 16410024 / 6/22/2018          15

## **CERTIFICATE OF SERVICE**

I, Andrew J. Herink, one of the attorneys for the Plaintiffs, certify that on June 22, 2018, I electronically filed the foregoing *Memorandum* with the Clerk of the Court using the Court's electronic filing system. This filing was served on all parties via the Court's electronic filing system.

June 22, 2018                                               Respectfully submitted,

*/s/ Andrew J. Herink*
Andrew J. Herink (#06303510)
Central States Law Department
9377 West Higgins Road, 10th Floor
Rosemont, Illinois 60018
Phone: (847) 939-2458
Fax: (847) 518-9797
aherink@centralstatesfunds.org
ATTORNEY FOR PLAINTIFFS