**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, and ARTHUR H. BUNTE, JR., as Trustee, | |
| Plaintiffs, | Case No. 16-cv-8439 |
| v. | Judge John Robert Blakey |
| PHBC, LLC, et al., | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Central States, Southeast and Southwest Areas Pension Fund and fund trustee Arthur Bunte, Jr., bring this action in connection with non-party Port Huron Building Supply Co.'s (Port Huron) withdrawal from a multiemployer pension plan (the Fund). Such withdrawals incur liability under the Employee Retirement Income Security Act of 1974 (ERISA), as amended by the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 29 USC § 1001 *et seq*.

In 2016, Plaintiffs obtained a judgment against Port Huron for withdrawal liability, but the principal amount of that liability remains due. Plaintiffs now bring claims for: (1) defaulted withdrawal liability against PHBC, LLC (PHBC) and ML Land Company, LLC (ML Land) (Count I); and (2) defaulted withdrawal liability against L&L Land Company, LLC (L&L) and individual defendant Michael Lauth (Count II). [60]. Before this Court is Plaintiffs' motion for summary judgment against

1

all Defendants [63]. For the reasons stated below, this Court grants Plaintiffs' motion as to ML Land, PHBC, and L&L, and denies it as to Lauth.

## I. Background

The facts in this Court's discussion come from Plaintiffs' statement of material facts [65]; Defendants' response to the Plaintiffs' statement of facts [71]; Defendants' statement of additional facts [72]; and Plaintiffs' response to Defendants' statement of additional facts [75].

### A. The Parties

#### 1. Plaintiffs

The Fund is a multiemployer pension plan under ERISA. [65] ¶ 3. Arthur H. Bunte, Jr., is a present trustee and fiduciary of the Fund under 29 U.S.C. § 1002(21)(A), and he and his fellow trustees are the Fund's plan sponsor under 29 U.S.C. § 1301(a)(10). *Id.* ¶ 4.

#### 2. Defendants

##### a. ML Land

From 2007 through at least 2017, ML Land was a Michigan LLC. *Id.* ¶ 15. ML Land's operating agreement states that ML Land could "conduct its business under one or more assumed names," and sets forth how "net profits" and "income" would be split among its members. *Id.* ¶ 17. Lauth has been a manager of ML Land since 2007. [65-3] at 7.

In or before 2008, ML Land applied for and received a Federal Employer Identification Number (FEIN). [65] ¶ 19. Between 2008 and 2015, Lauth filed federal

2

tax returns and stated for each return that: (1) ML Land's "Principal business" activity was "Construction"; and (2) that he "materially participate[d]" in the operation of [ML Land]. *Id.* ¶ 20. Lauth also listed ML Land's expenses, including taxes and licenses, for each tax return between 2008 and 2015; and, for one or more years during this period, he listed bank charges, repairs and maintenance, and office expenses. *Id.* For each of his federal tax returns for 2008 to 2015, Lauth deducted as business losses the ML Land expenses he reported. *Id.* ¶ 21.

In March 1998, ML Land entered into a land contract, agreeing to convey a real estate parcel to Willy's Workshop, Inc., a car restoration business, in exchange for $87,000 plus interest, to be paid in monthly $900 installments. *Id.* ¶ 22. ML Land owned the parcel until February 2014, when it transferred the parcel to Willy's via a quit claim deed. *Id.* ¶ 23.

### b. PHBC

PHBC was a Michigan LLC from about 2007 to 2017. *Id.* ¶ 28. From in or before 2008 through at least 2016, PHBC owned real estate at 3555 and 3536 Electric Avenue in Port Huron, Michigan. *Id.* ¶ 29. From 2008 through April 2016, Port Huron operated a retail hardware store at 3555 Electric; from 2008 through April 2013, Port Huron operated a concrete block plant on 3536 Electric. *Id.* ¶ 30. PHBC never charged or collected rent from Port Huron. [72] ¶ 6.

### c. L&L

#### i. The Conversion

In 1990, L&L was formed as a Michigan limited partnership. [65] ¶ 31. Lauth was a general partner of L&L from May 30, 1990 through December 10, 2009. *Id.* ¶ 32. On December 10, 2009, L&L, through the law firm Couzens Lansky Fealk Ellis Roeder & Lazar, P.C. (Couzens Lansky), faxed to the State of Michigan a document signed by Lauth and titled Articles of Organization and Certificate of Conversion, which provided that L&L was being converted to an LLC (the Conversion). *Id.* ¶ 33.

While it occurred in December 2009, Lauth says that Couzens Lansky and his accountant first proposed the Conversion to him in late 2004 or early 2005. [72] ¶ 15. In February 2005, Lauth signed an operating agreement, certificate of conversion, and affidavit of interest for the Conversion (the Conversion documents). *Id.* ¶ 17. After signing the Conversion documents in 2005, Lauth never told anyone to not proceed with the Conversion. *Id.* ¶ 18. In 2009, however, Couzens Lansky discovered that the Conversion documents had not been filed back in 2005. *Id.* ¶¶ 20, 22. Lauth says that it was only after this discovery that Couzens Lansky submitted the Conversion documents. *Id.* ¶ 24.

#### ii. L&L's Post-Conversion Activities

After the Conversion, from 2010 through 2016, L&L was a Michigan LLC. [65] ¶ 36. Between 2010 and 2015, L&L owned and leased 11 commercial real estate parcels and 6 residential real estate parcels, earning at least $275,000 each year in

4

rent. *Id.* ¶¶ 37–39. Between 2008 through 2015, L&L's agents performed repairs and maintenance on the parcels. *Id.* ¶ 40.

L&L applied for and received a FEIN in or before 2009. *Id.* ¶ 43. For each of its tax returns between 2008 through 2015, L&L reported that its "Principal business activity" was "Real Estate" and that its "Principal product or service" was "Rental." *Id.* ¶ 41. L&L deducted expenses for repairs, insurance, legal and professional fees, taxes, and utilities on each of those tax returns. *Id.* ¶ 42.

### iii. L&L's Ownership

From 2009 through present, there have always been 200 Class A (voting) units and 1800 Class B (non-voting) units in L&L. *Id.* ¶ 45.

The Harold Lauth Living Trust Agreement (Trust Agreement) created the Harold Lauth Marital Trust (marital trust) and the Harold Lauth Residuary Trust (residuary trust). *Id.* ¶ 49.

As of December 11, 2009, L&L's ownership was divided such that: (1) the marital trust owned 84.44 Class A units and 759.96 Class B units; (2) the residuary trust owned 15.56 Class A and 140.04 Class B units; and (3) Lauth's living trust owned the remaining 100 Class A and 900 Class B units. *Id.* ¶ 46. On December 30, 2009, the marital trust transferred 422.218 Class B units to Lauth's sister, Cynthia Chapdelaine. *Id.* ¶ 47.

Lauth's mother, Constance Lauth, died in July 2011. *Id.* ¶ 8. Pursuant to the Trust Agreement, the trustees distributed the marital trust's corpus to the residuary trust after Constance's death. *Id.* ¶ 50.

Article Twelfth, Part I, of the Trust Agreement further provides that, upon Constance's death,

> the Disinterested Trustee shall make a determination as to whether MICHAEL P. LAUTH is desirous of operating the businesses owned by the Grantor, namely, PORT HURON BUILDING SUPPLY COMPANY, INC. and L & L LAND COMPANY, a Michigan Co-Partnership. Solely for the purpose of determining that portion of the businesses which are to be allocated, as hereinbelow provided, and which portions are to be subject to the option, as hereinbelow provided, the Trustee, at the time set forth in the preceding sentence, shall compute the respective shares pursuant to Section (A) of PART III of ARTICLE TWELFTH without reference hereto. When allocating the various trust assets to such shares, the Disinterested Trustee shall allocate, to the extent possible, the businesses owned by the Grantor to the share of MICHAEL P. LAUTH if he is so determined to be desirous of operating said business. In the event less than one hundred percent (100%) of such businesses are so allocated to such child, such child shall have the option for three hundred sixty-five (365) days to purchase the portions of said businesses not so allocated to him from the Trust. . . .

[72] ¶ 28; [65-32] at 102. In addition, Article Twelfth, Part III(a) states that, upon Constance's death,

> after giving effect to the provisions of PART I and PART II of this ARTICLE TWELFTH, but not prior to the earlier of the expiration of the option period or exercise of the option as set forth in PART I of ARTICLE TWELFTH hereof, the Trustee shall divide the then remaining principal and any accumulated income of the Trust Estate into as many equal parts or shares as the Grantor shall have then living children and deceased children with then living issue.

[72] ¶ 29; [65-32] at 109.

In April 2013, the marital trust executed an assignment, transferring 42.21791 Class A units to Lauth and 42.22209 Class A units to Chapdelaine. [65] ¶ 48.

6

### d. Lauth

On December 31, 2012, Lauth directly or indirectly owned at least 80% of the total combined voting power of all classes of outstanding stock entitled to vote or at least 80% of the total value of outstanding shares of all classes of Port Huron's stock. *Id.* ¶ 6. On December 31, 2012, Lauth also directly or indirectly owned at least 80% of the ownership interests in PHBC and at least 80% of the ownership interests in ML Land. *Id.* ¶ 7. From 2002 to 2009, Port Huron requested and received from the Fund six withdrawal liability estimates, all of which were provided to Lauth. *Id.* ¶ 56.

### B. The Partial Withdrawal

The Fund determined that Port Huron effected a partial withdrawal on December 31, 2012 and incurred withdrawal liability in the principal amount of $2,114,166.93. *Id.* ¶ 9. In March 2016, the Fund obtained a judgment against Port Huron for the withdrawal liability in *Central States, Southeast and Southwest Areas Pension Fund, et al. v. Port Huron Building Supply Co.*, No. 15-cv-2559, Dkt. No. 39 (N.D. Ill. Mar. 31, 2016) (Ellis, J.). *Id.* ¶ 13. The full principal amount of the withdrawal liability remains due and owing. *Id.*

## II. Legal Standard

Courts should grant summary judgment when the moving party shows that no genuine dispute exists as to any material fact and the evidence weighs so heavily in the moving party's favor that the moving party "must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also* Fed. R. Civ. P. 56. A genuine dispute as to a material fact exists when, based upon the evidence, a

7

reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248. To show a genuine dispute as to a material fact, the non-moving party must point to "particular materials in the record," and cannot rely upon the pleadings or speculation. *Olendzki v. Rossi*, 765 F.3d 742, 746 (7th Cir. 2014).

At summary judgment, courts must evaluate evidence in the light most favorable to the non-moving party and must refrain from making credibility determinations or weighing evidence. *Rasho v. Elyea*, 856 F.3d 469, 477 (7th Cir. 2017). The moving party bears the burden of establishing the lack of genuine disputes as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### III. Analysis

Plaintiffs move for summary judgment upon the bases that: (1) all three entity Defendants—ML Land, L&L, and PHBC—are subject to withdrawal liability because they were "trades or businesses" under "common control" with Port Huron on the withdrawal date; and (2) Lauth is personally liable because he tried to "evade or avoid" withdrawal liability when he executed the Conversion. [63]. This Court addresses the standards for determining withdrawal liability upon these bases, and then applies them to each Defendant in turn.

#### A. Withdrawal Liability of Trades or Businesses Under Common Control

Under ERISA, "all 'trades or businesses' under 'common control' with the withdrawing employer are treated as a single entity for purposes of assessing and collecting withdrawal liability." *Cent. States Se. & Sw. Areas Pension Fund v. Messina Prod., LLC*, 706 F.3d 874, 878 (7th Cir. 2013) (quoting 29 U.S.C. §

1301(b)(1)). Each trade or business found to be under common control is jointly and severally liable for the withdrawal liability of another. *Id.*

### 1. Trade or Business

Although Section 1301(b)(1) does not define "trade or business," the Seventh Circuit has adopted two general approaches for determining whether an entity qualifies.

The first approach holds that leasing property to a withdrawing employer "categorically" constitutes a trade or business. *Messina*, 706 F.3d at 881. This approach is based upon the underlying purpose of the MPPAA, which is to "prevent the dissipation of assets required to secure vested pension benefits." *Cent. States, Se. & Sw. Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1374 (7th Cir. 1992). Employers who move assets in this manner are said to be "fractionalizing" their business. *Messina*, 706 F.3d at 878. Because the MPPAA was passed to prevent "fractionalizing," the Seventh Circuit has held that, where a company under common control leases property to the withdrawing employer, it is "categorically" considered a trade or business covered by the MPPAA and ERISA. *Id.* at 881–82; *Cent. States, Se. & Sw. Areas Pension Fund v. SCOFBP, LLC*, 668 F.3d 873, 879 (7th Cir. 2011).

The second approach for defining "trade or business" is to use the more fact-intensive *Groetzinger* method. In order to have engaged in a trade or a business under this approach: (1) the organization's economic activity must have been for the primary purpose of income or profit; and (2) the activity must have been done with continuity and regularity. *Commissioner v. Groetzinger*, 480 U.S. 23, 35 (1987).

The Seventh Circuit has explained that both tests are generally appropriate, and has provided guidance on when to use each one. *See Cent. States, Se. & Sw. Areas Pension Fund v. Nagy*, 714 F.3d 545, 551 (7th Cir. 2013). Where property is leased to the withdrawing employer itself, the categorical rule applies. *Id.* Where property has not been leased to the withdrawing employer, the fact-specific test of *Groetzinger* applies. *Id.* at 550.

### 2. Common Control

The Pension Benefit Guarantee Corporation (PBGC) has adopted the language in Section 414(c) of the Internal Revenue Code, which identifies both "parent-subsidiary" and "brother-sister" organization groups as forms of "common control." *See Cent. States, Se. & Sw. Areas Pension Fund v. SCOFBP, LLC*, 738 F. Supp. 2d 840, 846 (N.D. Ill. 2010), *aff'd*, 668 F.3d 873 (7th Cir. 2011). Under Section 414(c), a "parent-subsidiary group is one in which one or more chains of organizations are connected through a common controlling interest (80 percent of the stock)." *Id.* (internal quotation marks omitted). A "brother-sister group is one in which (1) five or fewer persons who are individuals, estates, or trusts own a controlling interest (at least 80 percent of the stock) in two or more organizations and (2) the same persons maintain effective control (at least 50 percent of the stock) over each organization." *Id.*

### B. Evade or Avoid Withdrawal Liability

ERISA contains provisions that "ensure that employers live up to the obligations they owe to the pension fund and to the employees who participate in it," and to that end, Congress has "recognized that employers that have substantial

10

pension liabilities may attempt to shirk their obligations through deceptive transactions." *Chicago Truck Drivers v. El Paso Co.*, 525 F.3d 591, 596 (7th Cir. 2008). Therefore, if "a principal purpose of any transaction is to evade or avoid liability," liability shall be determined and collected without regard to such transaction. 29 U.S.C. § 1392.

### C. Defendants' Withdrawal Liability

#### 1. ML Land

Defendants do not dispute that ML Land was in common control with Port Huron as of the December 31, 2012 withdrawal,[1] but contend that ML Land has never been a trade or business. [73] at 3. Defendants attempt to cast ML Land as a mere passive investment vehicle for Lauth, relying heavily upon the fact that Lauth testified that ML Land was formed for investment purposes and that its only activity related to the "passive receipt" of money from a March 1998 land contract. *See* [73] at 3.

This Court disagrees. While Defendants are correct that mere "possession of a property" cannot support a finding that the property engaged in a trade or business, *Cent. States, Se. & Sw. Areas Pension Fund v. Fulkerson*, 238 F.3d 891, 895 (7th Cir. 2001), the record contains other facts undermining Defendants' characterization of ML Land as a passive investment property.

---

[1] Common control is determined as of the withdrawal date. *See Messina*, 706 F.3d at 886 (citing *IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 125–26 (3d Cir. 1986)); *Cent. States, Se. & Sw. Areas Pension Fund v. Ray C. Hughes, Inc.*, No. CIV.A. 09 C 7201, 2012 WL 1520721, at *2 (N.D. Ill. Apr. 30, 2012).

11

For instance, it is undisputed that ML Land was an LLC, [65] ¶ 15, and under controlling Seventh Circuit law, formal business organizations are presumptively trades or businesses. *See SCOFBP*, 668 F.3d at 878 (because they "ordinarily operate with continuity and regularity and are ordinarily formed for the primary purpose of income or profit, it seems highly unlikely that a formal for-profit business organization would not qualify as a trade or business.") (internal quotation marks omitted). Additionally, ML Land stated in its own operating agreement that its purpose was to conduct "business." [65] ¶ 17. This fact likewise supports a finding that ML Land constituted a trade or business. *Messina*, 706 F.3d at 885–86 (holding that a defendant's stated intention of forming a business in its operating agreement is also "highly relevant," because it constitutes a declaration against interest).

It is further undisputed that ML Land applied for and received a FEIN, and that it consistently filed annual tax returns listing "Construction" as its "Principal business" activity. [65] ¶ 19. Lauth also claimed as business losses the ML Land expenses he reported. *Id.* ¶ 21. These facts constitute "strong evidence" confirming the continuity and regularity of a trade or business. *Cent. States, Se. & Sw. Pension Fund v. Pers., Inc.*, 974 F.2d 789, 795 (7th Cir. 1992) (claiming tax deductions for expenses is "strong evidence" that real estate activities constitute a trade or business).

On this record, this Court finds that the evidence weighs so heavily in favor of finding ML Land a trade or business that no fact-finder could reasonably conclude

otherwise. And because Defendants concede common control, [73] at 3, this Court grants summary judgment to Plaintiffs as to ML Land.

### 2. PHBC

Defendants do not contest that PHBC was under common control with Port Huron, [73] at 6–8, but argue that PHBC is not a trade or business. Plaintiffs argue that this Court should find that PHBC was categorically a trade or business because it was "leasing property" to a withdrawing employer—here, Port Huron. [64] at 11.

In *Messina*, the Seventh Circuit instructed that where "real estate is rented to *or used* by the withdrawing employer and there is common ownership, it is improbable that the rental activity could be deemed a truly passive investment. In such situations, the likelihood that a true purpose of the 'lease' is to split up the withdrawing employer's assets is self-evident." 706 F.3d at 882 (emphasis added). The categorical rule therefore applies where the withdrawing employer leases *or uses* property under common control.

Here, the parties do not dispute that, as of the date of withdrawal, Port Huron used and operated businesses on two properties that PHBC owned. [65] ¶¶ 29–30. As such, the categorical rule plainly applies, qualifying PHBC as a trade or business under ERISA. And because Defendants concede common control, this Court grants summary judgment to Plaintiffs as to PHBC.

### 3. L&L

Defendants dispute both that L&L was (1) a trade or business, and (2) under common control with Port Huron. [73] at 8–10.

13

### a. Trade or Business

Defendants contend that L&L was engaged in the "passive inheritance and ownership of real estate," urging this Court to consider L&L a passive investment rather than a trade or business. *Id.* at 8. Defendants ignore, however, the other highly persuasive factors that weigh in favor of finding that L&L was a trade or business. Those factors include that L&L: (1) was formally incorporated as an LLC; (2) owned and leased 17 real estate parcels and earned at least $275,000 each year from rental income; (3) had agents continuously perform repairs and maintenance on those parcels; (4) stated on tax returns that its "Principal business activity" was "Real Estate"; and (5) deducted expenses for repairs, insurance, legal and professional fees, taxes, and utilities on those tax returns. [65] ¶¶ 36–43.

Given these facts, the record confirms that L&L was not merely a personal investment. Indeed, its business-related activities were even more robust than those of ML Land; and L&L's real estate activities (that allowed it to collect rent on 17 different parcels) were continuous, regular, and designed to produce income, qualifying it as a trade or business. *See, e.g., Cent. States, Se. & Sw. Areas Pension Fund v. CLP Venture, LLC*, No. 11 C 3785, 2012 WL 6680302, at *7 (N.D. Ill. Dec. 21, 2012) (finding as a matter of law that defendants engaged in trade or business where they were formally organized, claimed business deductions in tax filings, and earned rental income), *aff'd*, 760 F.3d 745 (7th Cir. 2014).

14

### b. Common Control

The parties dispute the extent of Lauth's ownership of L&L as of December 31, 2012, the withdrawal date. Plaintiffs argue that Lauth owned all 200 Class A units on the withdrawal date. [74] at 2. Defendants counter that in 2011, upon the death of Lauth's mother Constance, L&L's interests became equally divided between Lauth and his sister, so that by the withdrawal date Lauth owned less than 80% of L&L's total interests. [73] at 10.

Defendants' argument remains premised upon the Trust Agreement itself; they argue that, by operation of Article Twelfth of the Trust Agreement, the residuary trust distributed the 100 Class A units it owned to Lauth and Chapdelaine, equally, upon Constance's death. *Id.* at 9–10. Defendants' argument, however, finds no basis in the plain language of the Trust Agreement. Article Twelfth, Part I, states that, upon Constance's death,

> the Disinterested Trustee shall make a determination as to whether MICHAEL P. LAUTH is desirous of operating the businesses owned by the Grantor, namely, PORT HURON BUILDING SUPPLY COMPANY, INC. and L & L LAND COMPANY, a Michigan Co-Partnership. Solely for the purpose of determining that portion of the businesses which are to be allocated, as hereinbelow provided, and which portions are to be subject to the option, as hereinbelow provided, the Trustee, at the time set forth in the preceding sentence, shall compute the respective shares pursuant to Section (A) of PART III of ARTICLE TWELFTH without reference hereto.

[72] ¶ 28. Article Twelfth, Part III(a) then states that, "*after giving effect to*" Part I, the trustee "shall divide the then remaining principal and any accumulated income of the Trust Estate into as many equal parts or shares as the Grantor shall have then living children and deceased children with then living issue." *Id.* ¶ 29 (emphasis

15

added). In short, Article Twelfth sets forth a series of determinations and events that were to occur after Constance's death, one of which included the eventual equal allocation of L&L stock between Lauth and Chapdelaine. It does not provide, however, that the allocation occurs immediately upon Constance's death.

To the contrary, the record makes clear that it was not until April 2013 that the marital trust executed an assignment transferring 42.21791 Class A units to Lauth and 42.22209 Class A units to Chapdelaine. [65] ¶ 48.[2] Because the assignment postdates the December 2012 withdrawal, Plaintiffs are correct that, as of the withdrawal date, L&L's Class A units were the same as it was in December 2009: (1) marital trust owned 84.44 Class A units; (2) residuary trust owned 15.56 Class A units; and (3) Lauth's living trust owned the remaining 100 Class A units. [64] at 7.

Based upon this state of L&L ownership, this Court finds that Lauth effectively owned the 100 Class A units held by the marital and residuary trusts, in addition to the 100 Class A units he already owned, as of the withdrawal date. This is because under IRS regulations, which supply the standards under which this Court determines common control,[3] "interests owned by a trust are considered owned by the beneficiaries who have an actuarial interest of five percent or more in the

---

[2] Defendants also point to a May 16, 2012 letter from probate counsel, [65-4] at 6–8, which they argue reflects that the residuary trust allocated assets between Lauth and Chapdelaine before the December 2012 withdrawal. [73] at 10. Not so. This letter merely sets forth the details of the allocation, including how many shares Lauth and Chapdelaine would receive once the allocation became effective; it does not, however, say that the allocation would occur by December 2012. [65-4] at 6–8.

[3] *See* 29 U.S.C. § 1301(b)(1).

16

organization interest, to the extent of such actuarial interest." *SCOFBP*, 738 F. Supp. 2d at 846 (citing 26 C.F.R. § 1.414(c)-4(b)(3)). A beneficiary's "actuarial interest" is determined by "assuming the maximum exercise of discretion by the fiduciary in favor of such beneficiary and the maximum use of the organization interest to satisfy the beneficiary's rights." *Id.*

The parties agree that, upon Constance's death, the marital trust's assets—including the 84.44 L&L Class A units it owned—transferred to the residuary trust. [65] ¶ 50; [73] at 9. Further, Article Twelfth of the Trust Agreement, which concerns the residuary trust, provides that, upon Constance's death, the trustee shall determine whether Lauth "is desirous of operating" Port Huron and L&L and "shall allocate, to the extent possible, the businesses owned by the Grantor to the share of [Lauth] if he is [so] desirous." [65] ¶ 51. The terms of the Trust Agreement thus provided the trustee with discretion to distribute all of the residuary trust's L&L shares to Lauth.

Because a trust beneficiary's interest in an entity is determined by assuming the exercise of maximum discretion in his favor, 26 C.F.R. § 1.414(c)-4(b)(3), Lauth is deemed to own all 200 Class A units of L&L upon the death of his mother. *See, e.g.*, *SCOFBP*, 738 F. Supp. 2d at 846 ("Cappy is presumed to have had a near 100 percent actuarial interest in the MLC Family Trusts' assets because nothing in the trust documents limits the trustees' discretion to use all of trust assets for Cappy's benefit.").

17

Lauth's ownership of 100% of Class A L&L units as of the withdrawal date means that he had both controlling interest in and effective control over L&L on that date. 26 C.F.R. § 1.414(c)-2(b)(2)–2(c)(2).[4] Also, it is undisputed that Lauth owned at least 80% of Port Huron's total combined voting power of outstanding stock entitled to vote, *see* [65] ¶ 6, so he had both a controlling interest in and effective control over Port Huron. Accordingly, this Court finds as a matter of law that L&L and Port Huron were under common control. *See SCOFBP*, 739 F. Supp. 2d at 846 (common control can be found where (1) five or fewer persons who are individuals, estates, or trusts own a controlling interest in two or more organizations and (2) the same persons maintain effective control over each organization).

Because this Court finds as a matter of law that L&L was a trade or business under common control with Port Huron, it grants summary judgment to Plaintiffs as to L&L.

### 4. Lauth

Plaintiffs argue that Lauth is personally liable for withdrawal liability because evading withdrawal liability as an L&L general partner was a principal purpose behind the Conversion. [64] at 12.

In support of this argument, Plaintiffs points not to any admissions, but to a series of events occurring before and after the Conversion, arguing that they

---

[4] This regulatory provision provides that a person has a controlling interest over an LLC that issues membership units where he owns units "possessing at least 80 percent of total combined voting power of all classes of" units "entitled to vote," and a person has effective control over an LLC where he owns units "possessing at least 50 percent of total combined voting power of all classes of" units "entitled to vote."

18

altogether are suggestive that Lauth executed the Conversion to avoid withdrawal liability. These events include the fact that, from 2002 to 2009, Port Huron requested six withdrawal liability estimates. [65] ¶ 56. Further, after the Conversion in 2009, Lauth entered into two transactions that allowed Chapdelaine to receive just enough L&L units to reduce Lauth's interest in L&L to 79%, just below the 80% controlling interest threshold. *Id.* ¶¶ 47–48; [64] at 12. Plaintiffs also argue that the existence of attorney-client communications between Lauth and his attorneys both before and after the Conversion suggests that they were "preoccupied" with withdrawal liability exposure up until the Class A units transfer was complete in 2013. [64] at 12–14.

In response, Defendants deny that any purpose of the Conversion was to allow Lauth to avoid withdrawal liability. In support, Defendants point primarily to the fact that Lauth says his attorneys and accountant first proposed the Conversion to him in late 2004 or 2005, years before the Conversion actually occurred. [72] ¶ 15. Lauth signed the Conversion documents in 2005 and never told anyone not to proceed with the Conversion. *Id.* ¶ 18. His attorneys, however, did not discover until 2009 that the Conversion documents were not filed back in 2005. *Id.* ¶¶ 20–22, 24.

Viewed in its entirety, the record evidence creates genuine issues of material fact about whether evading withdrawal liability was a principal purpose behind the Conversion. For example, Defendants' evidence shows that Lauth intended the Conversion to be effective in 2005, 7 years before Port Huron's withdrawal, therein creating a question of whether Lauth even had an inkling of impending withdrawal

liability at the time he signed off on the Conversion. Accordingly, this Court denies summary judgment as to Lauth.

## IV. Conclusion

For the reasons stated, Plaintiffs' motion for summary judgment [63] is granted as to Defendants ML Land, PHBC, and L&L, and denied as to Lauth. All dates and deadlines stand.

Dated: October 9, 2018

Entered:

_____
John Robert Blakey
United States District Judge